TUCKER ELLIS LLP
MATTHEW I. KAPLAN SBN 177242
matthew.kaplan@tuckerellis.com
EDWARD W. RACEK SBN 235184
edward.racek@tuckerellis.com
515 South Flower Street
Forty-Second Floor
Los Angeles, CA 90071
Telephone:  213.430.3400
Facsimile:   213.430.3409

TUCKER ELLIS LLP
JOHN Q. LEWIS (*pro hac vice* forthcoming)
john.lewis@tuckerellis.com
SAVANNAH M. FOX (*pro hac vice* forthcoming)
savannah.fox@tuckerellis.com
950 Main Avenue, Suite 1100
Cleveland, OH 44113
Telephone:  216.592.5000
Facsimile:   216.592.5009

Attorneys for Plaintiff
James D. McCool

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES D. MCCOOL, | Case No. |
| Plaintiff, | |
| v. | **COMPLAINT FOR:** |
| DENISE WILSON; ALLEN MATKINS LECK GAMBLE MALLORY & NATSIS, LLP; CLARK LIBENSON; THE PRACTICE CERTIFIED PUBLIC ACCOUNTANTS, INC.; ADAM OCHOA; and DOES 1 through 10, inclusive, | **1) FRAUD**<br>**2) NEGLIGENT MISREPRESENTATION**<br>**3) BREACH OF CONTRACT**<br>**4) VIOLATION OF CAL. CORP. CODE §§ 25401, 25501**<br>**5) VIOLATION OF RULE 10B-5**<br>**6) BREACH OF DUTY OF LOYALTY**<br>**7) VIOLATION OF CAL. CORP. CODE § 25504.1** |
| Defendants. | **JURY TRIAL DEMANDED** |

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

Plaintiff James D. McCool ("Jim") brings this Complaint against defendants Denise Wilson ("Denise"), Allen Matkins Leck Gamble Mallory & Natsis, LLP ("Allen Matkins"), Clark Libenson ("Mr. Libenson"), The Practice Certified Public Accountants, Inc. ("Accounting Firm"), and Adam Ochoa ("Mr. Ochoa") and alleges as follows:

## INTRODUCTION

1.      This case is about how Denise Wilson – desperate to save herself and her aviation management companies from financial ruin – fraudulently induced multi-million dollar investments from Jim McCool by intentionally misrepresenting the financial health, ownership interests, and liabilities of those entities.

2.      Late in 2017, Jim landed his private plane at Thermal Airport near Palm Springs, California, and chose aircraft servicer Desert Jet to park, store, fuel, and perform routine maintenance on his plane. Jim noted to the staff that he had been impressed by the degree of service he received in his limited time there.  In turn, the staff offered to introduce Jim to Desert Jet's "owner," Denise Wilson. Jim agreed to meet Denise.

3.      Unknown to Jim at the time, Denise happened to be at a crossroads. Since its inception, Denise had carefully orchestrated positive publicity about herself and Desert Jet and cleverly depicted Desert Jet to all who would listen as a financially successful, growing company.  In reality, however, Desert Jet's day-to-day operations and financial stability were steadily falling apart under her leadership.  Desert Jet was losing more money by the day, incurring crippling liabilities, and not generating enough revenue to pay even its ordinary monthly bills.

4.      At the same time, Denise was having personal financial problems as she faced unpaid taxes and costly personal expenses. The walls were caving in on her and she was desperate for an immediate infusion of large amounts of cash. Denise knew that a large investment would be to her benefit because it would bail her out of her desperate situation at Desert Jet. She also knew that she could structure a potential investment so that she would receive a dividend that would immediately solve her own financial problems. None of this was known or revealed by Denise to Jim at the time.

5.      Instead, Denise employed her formidable deception skills to coax Jim into investing cash into her distressed company. When Denise described the Desert Jet business to Jim, she lied about the gravity of the situation and instead painted a picture of a company with a reputable history poised for potential. She pointed to the numerous awards she and her company received and Desert Jet's recognition as one of the nation's fastest growing companies.  Denise also promised Jim unfettered transparency into the books and records of the company. She mentioned nothing about Desert Jet's mounting financial woes or her own.

6.       Seeing no evidence at that time that Desert Jet was in distress and given Denise's representations about the health and potential of the company, Jim agreed to invest. Because Desert Jet offered its services through five separate limited liability companies (collectively, "Desert Jet Entities"), a parent company, Desert Jet Holdings, LLC, was formed to facilitate Jim's cash investment and Denise's contribution of the Desert Jet Entities to the venture.

7.      In the summer of 2018, due diligence and valuations were conducted on the Desert Jet Entities to determine how much cash Jim would invest into the holding company. Based on the books and financial records Desert Jet provided at Denise's direction, a valuation firm named CBIZ determined that the Desert Jet Entities were worth between $7 and $11 million. Unbeknownst to Jim or CBIZ at the time, however, Denise had intentionally misrepresented and omitted material facts about the Desert Jet Entities to inflate their value, all with the help of legal counsel, Clark Libenson of Allen Matkins, and her accountant, Adam Ochoa of The Practice Certified Public Accountants, Inc.

8.      Jim did not know and had no reason to believe that Denise, her lawyers, and her accountants were orchestrating a fraudulent scheme to pump up the valuation of the Desert Jet Entities; thus, Jim, placing the value of Desert Jet Holdings at $11 million, offered $5 million in exchange for 35 percent ownership. Later on in the discussions, Jim asked Denise for 40 percent ownership given the active financial expertise that Jim would

bring to the holding company.

9.     In response, Denise surprisingly offered Jim 50 percent ownership for a $6 million investment, if she received a $1 million cash distribution from Desert Jet Holdings. Thinking the deal was fair, Jim agreed to Denise's proposed terms.

10.    On August 14, 2018, the agreement was executed. Jim invested $6 million in cash in exchange for 49 percent ownership in Desert Jet Holdings. Denise contributed the Desert Jet Entities in exchange for 51 percent ownership plus a $1 million dividend, half of which was paid at closing, and the other half of which was conditioned on, among other things, obtaining bank financing. The other half has not yet been paid because the conditions precedent have not been met to trigger the declaration of the dividend.

11.    Soon after the investment, evidence of Denise's ploy started to come to light. First, it became clear after closing that Denise failed to present Jim with financial statements for the Desert Jet Entities that were prepared in accordance with accepted accounting principles and that fairly presented the financial condition of the business. These fraudulent financial statements led Jim to believe that $11 million was a fair value, but when scrubbed of deceit the Desert Jet Entities were worth materially less. Jim, therefore, did not receive an ownership interest reflective of his investment.

12.    Second, Denise lied when she told Jim that she was the 100 percent owner of the Desert Jet Entities. In fact, her husband, Alan Robert Wilson, still maintains ownership in at least one of the Desert Jet Entities, resulting in Jim owning less than he expected. This misrepresentation has led to considerable expense, prevented Desert Jet Holdings from obtaining current bank financing, and has further devalued the company. Moreover, it means that Denise contributed significantly less than the represented $7 million of value to Desert Jet Holdings.

13.    Third, Jim has exposed at least six material liabilities that Denise concealed at the time of his investment. The various Desert Jet Entities face liability for a sexual harassment lawsuit, a dispute over a commercial agreement, outstanding loans, unpaid state and federal taxes, a potential lawsuit by Desert Jet's former COO, and a $250,000

bank loan distributed to Desert Jet Holdings by Pacific Premier Bank for Denise's own personal gain. All of these liabilities detract from the value of Denise's contribution and endanger the financial future of Desert Jet Holdings.

14.    Simply put, Denise engineered intentional misrepresentations in a fraudulent scheme designed to entice an investment from Jim.

15.    Furthermore, Denise's misconduct continued even after she elicited Jim's investment. As a manager, Denise has continued to put her own self-interests above the needs of the company by violating the duty of loyalty she owes to Jim as a member of Desert Jet Holdings. Among a slew of calculated moves, Denise distributed $30,000 to herself and $80,000 to Desert Jet Consulting (an entity owned by Denise) by borrowing against the Desert Jet Holdings line of credit, filed at least one fraudulent tax return, and manipulated the company's financial records for her own personal gain; actions on theme with past behaviors to benefit herself at Jim's expense and the expense of others.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that the matter in controversy involves federal questions under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder by the SEC. 15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5.

17.    This Court has supplemental jurisdiction over the other claims asserted herein, pursuant to 28 U.S.C. § 1367.

18.    Plaintiff contends that venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the securities that are the subject of this lawsuit, and the alleged omissions of material fact, as well as the false and misleading statements, were made in or issued from this District. In addition, upon information and belief, at least one Defendant is a resident in this District.

## PARTIES

19.    Plaintiff James D. McCool is, and at all relevant times was, an individual who resides in the State of Ohio.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

20. Defendant Denise Wilson is, and at all relevant times was, an individual who resides in the State of California.

21. Defendant Allen Matkins Leck Gamble Mallory & Natsis ("Allen Matkins") is, and at all relevant times was, a California limited liability partnership with its principal place of business in Los Angeles, California.

22. Defendant Clark Libenson is, and at all relevant times was, an individual who resides in the State of California.

23. Defendant The Practice Certified Public Accountants, Inc., is, and at all relevant times was, a California corporation with its principal place of business in Thermal, California.

24. Defendant Adam Ochoa is, and at all relevant times was, an individual who resides in the State of California.

25. Plaintiff is ignorant of the true names and capacities of the defendants sued in this action as John Does 1 to 10 inclusive, and for that reason has sued them by their fictitious names. Upon information and belief, Plaintiff alleges that each of these fictitiously named defendants are responsible in some manner, either individually or in conspiracy of other defendants, for some or all of the acts alleged, and that Plaintiff's damages as alleged were legally caused by such defendants.

## FACTUAL BACKGROUND

26. In the spring of 2018, Jim landed his private turboprop at a Fixed-Based Operator ("FBO") called Desert Jet at the Jacqueline Cochran Regional Airport in Palm Springs, Thermal, California.

27. Unlike commercial aircrafts that are serviced by the airlines at the airport when grounded, third-party companies, called FBOs, provide services such as re-fueling, detailing, and maintenance to private aircraft.

28. Upon expressing satisfaction with his service at the Desert Jet FBO, Jim was introduced to the "owner," Denise Wilson. As it turned out, Desert Jet rented its space from another FBO and, among other growth plans noted by Denise, hoped to build a

state-of-the-art-hangar of its own. Denise urged Jim to invest in the Desert Jet business, holding it out as a world-class operation brimming with potential.

29.     In her pitch to Jim, Denise painted the picture of an ideal investment, which matched the public's perception of Desert Jet and herself. American Express featured Denise and Desert Jet as "flying high these days" with projected revenue of $15 million. Desert Jet had repeatedly ranked on the list of the nation's fastest growing companies and as one of the 50 Fastest Growing Women Led Companies.  In addition, Denise noted she had personally received numerous awards: "Women Who Rule" Award, Entrepreneurial Winning Women Award, and the Enterprising Women of the Year Award.

30.     In reality, the actual financial condition of Denise and the Desert Jet business were woefully different from public perception. Denise lied about and concealed material facts relating to the financials, liabilities, and ownership interests of Desert Jet to convince Jim to invest.

31.     Denise called upon her reputation in the industry and her superior knowledge in the field to divert Jim away from uncovering her lies. She also relied on the dissemination of materially false and misleading information by her lawyer, Mr. Libenson of Allen Matkins, and her accountant, Mr. Ochoa of The Practice Certified Public Accountants, Inc., to facilitate her scheme.

32.     By the summer of 2018, her deceptive plan came to fruition as Jim agreed to invest in the Desert Jet business.

**A. Jim agreed to invest $6 million in Desert Jet Holdings in August 2018.**

33.     Desert Jet provides aviation management services through five California limited liability companies: Desert Jet, LLC, Desert Jet Maintenance LLC, Desert Jet Charter LLC, Desert Jet TRM LLC, and Desert Jet Center LLC (collectively, the "Desert Jet Entities").

34.     In order for Jim to invest in the entire Desert Jet business, Jim and Denise agreed to form a Delaware limited liability company, Desert Jet Holdings, LLC ("Desert Jet Holdings"), to serve as a parent-holding company for the Desert Jet Entities.

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

35.     Denise represented that her husband, Alan Robert Wilson, maintained ownership in at least one of the five Desert Jet Entities, but that he transferred his interest so that only she would have equity.

36.     Before negotiations began, Jim engaged CBIZ, a valuation firm, to determine the value of the Desert Jet Entities. Based on the books and records provided by Denise, Jim valued the company between $7 and $11 million.

37.     Initially, Jim offered Denise $5 million in exchange for 35 percent ownership. Later on in the discussions, however, Jim asked Denise for 40 percent ownership with the difference in value being made up by the financial expertise that he would bring to the company.

38.     Instead, Denise offered Jim 50 percent ownership for a $6 million investment, if she also received a $1 million distribution from Desert Jet Holdings.

39.     Jim agreed to Denise's proposal.

40.     On August 14, 2018, Denise and Jim signed a Contribution and Subscription Agreement ("Contribution Agreement") under which Denise contributed her alleged 100 percent equity interests in the Desert Jet Entities to Desert Jet Holdings, and Jim contributed $6 million in cash. The Contribution and Subscription Agreement is attached as Exhibit A.

41.     In return of his investment, Jim received 49 of 100 Company Common Units in Desert Jet Holdings.

42.     Denise received the remaining 51 Units plus a $500,000 dividend, which was paid at closing from Jim's $6 million investment. Under Section 5.1 of the Contribution Agreement, Denise was to receive an additional $500,000 dividend as soon as Desert Jet Holdings obtained financing and its managers deemed it practicable to pay.

43.     The second portion of Denise's dividend has not yet been declared because her material misrepresentations, omissions, and the complete resignation of her financial management team in Q3 and Q4 of 2018 have prevented Desert Jet Holdings from obtaining the bank financing necessary to trigger the declaration of the dividend.

44.     Despite the slight disparity in their ownership interests, the Desert Jet Holdings, LLC Management Services Agreement, attached as Exhibit B, splits corporate governance responsibilities equally between Denise and Jim.

**B. Denise lied about and concealed material information to entice Jim's investment.**

45.     Since Jim invested in Desert Jet Holdings, he has learned that aspects of the Desert Jet business are not as Denise represented them both before the parties executed the Contribution Agreement and within the four corners of the Contribution Agreement itself. Had Jim known that Denise's portrait of Desert Jet was a mere façade, it would have called into question the terms of his investment, if not the decision to invest at all.

**1.     Denise swindled an overvalued investment from Jim through materially misleading financial statements.**

46.     Section 3.10 of the Contribution Agreement represents that Denise provided Jim with complete copies of the consolidated financial statements of the Desert Jet Entities, including income statements and balance sheets for 2015, 2016, 2017, and the three-months prior to March 31, 2018 ("Financial Statements").

47.     Section 3.10 also represents that the Financial Statements were prepared in accordance with GAAP and were based on the books and records of the Desert Jet Entities to fairly present their financial condition.

48.     Relying on these Financial Statements, Jim made an offer that valued the Desert Jet Entities at $11 million. Denise countered with an offer that recognized the value of her company at $7 million but that would net her an immediate cash distribution of $500,000 and a contingent cash distribution of another $500,000.

49.     Even with her own discounted valuation, Denise's contribution to Desert Jet Holdings was materially less than the value she alleged based on the actual financial condition of the Desert Jet Entities at the time of Jim's investment and according to the same valuation methodologies.

50.     Thus, Jim's $6 million investment should have bought him a greater percent economic interest in Desert Jet Holdings; or, stated alternatively, Jim could have bought

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

his 49 percent interest in Desert Jet Holdings with a much smaller investment.

**2.  Denise misrepresented the true owner of the Desert Jet Entities.**

51.  The Contribution Agreement states, at least six times, that Denise was the sole owner of the Desert Jet Entities and that she did not need the consent of anyone to complete the transactions contemplated by the Contribution Agreement.

52.  Recital C of the Contribution Agreement states, "Wilson owns 100% the equity interests in the Desert Jet Companies (the ***"Rollover Interests"***)."

53.  Section 3.2 of the Contribution Agreement states in part, "Wilson is the beneficial and record owner of, and has good and valid title to, the Rollover Interests that Wilson is contributing to the Company pursuant to Section 1.1, free and clear of all liens."

54.  Section 3.3 of the Contribution Agreement states in part, "Neither the execution of this Agreement nor the performance by Wilson of her obligations under this Agreement will violate or conflict with the Organizational Documents of any of the Desert Jet Companies or, except as would not be material, any other agreement, arrangement or commitment or any law."

55.  Section 3.4 of the Contribution Agreement states, "No Consent of any Person or Governmental Authority is required in connection with the execution and delivery by Wilson of this Agreement or the consummation of the transactions contemplated by this Agreement, except to the extent the failure to obtain such consent would not have a material adverse impact on the Company."

56.  Section 3.5 of the Contribution Agreement states in part, "The Rollover Interests constitute 100% of the total issued and outstanding membership interests in the Desert Jet Companies." Further, this Section provides that the interests were issued in compliance with the law and were not issued in violation of any preemptive or similar rights of any person.

57.  Section 3.6 of the Contribution states in part that "there are no agreements, understandings, or proposed transactions between the Desert Jet Companies and Wilson,

TUCKER ELLIS LLP

Chicago ◆ Cleveland ◆ Columbus ◆ Houston ◆ Los Angeles ◆ San Francisco ◆ St. Louis

or any officers, managers, consultants, or key employees, or to their respective spouses or children, or to any Affiliate of the foregoing." Moreover, none of these parties have a "direct or indirect ownership interest in any firm or entity with which Desert Jet Company is affiliated or with which any Desert Jet Company has a business relationship, or any firm or entity that competes with any Desert Jet Company."

58.     Despite repeatedly representing she was the 100 percent owner in the Contribution Agreement, Denise was not, in fact, the sole owner of the Desert Jet Entities at the time Jim and Denise executed the Contribution Agreement and Jim made a significant cash infusion into the company.

59.     Denise assured Jim that her husband, Alan Robert Wilson, transferred all of his interests to Denise before the Contribution Agreement was signed.

60.     Although Alan Robert Wilson's ownership interests were originally accounted for in earlier drafts of the Contribution Agreement, Denise instructed Jim and his legal counsel to remove any mention of him altogether.

61.     It has now become known that Alan Robert Wilson not only failed to transfer his interest to Denise before the Contribution Agreement was signed, but to this day, he still maintains that interest.

62.     Alan Robert Wilson never assigned his interest to Denise or Desert Jet Holdings because Denise was supposed to buy out his interest for $500,000 under a separate, previously undisclosed, agreement, but she has allegedly only paid $250,000 to date.

63.     Denise admitted that her representation that she owned 100 percent of the Desert Jet Entities was false.

64.     This misrepresentation has harmed Jim in two ways. First, continued ownership by Alan Robert Wilson has impeded Desert Jet Holdings from obtaining bank financing because the banks cannot reconcile the operating agreements for the entities that show conflicting ownership interests. Pacific Premier Bank has stated that it will not lend to Desert Jet for as long as Denise maintains ownership in Desert Jet to any degree.

65.     Second, Alan Robert Wilson's undisclosed ownership depletes value from Jim's investment. Instead of Desert Jet Holdings owning 100 percent of all the Desert Jet Entities, it now owns only 50 percent of one or more of these entities. As a result, Denise's supposedly "equal" investment in Desert Jet Holdings was significantly less than Jim's $6 million investment.

**3.     Denise concealed Desert Jet liabilities.**

66.     Under Section 3.11 of the Contribution Agreement, Denise represented that the Desert Jet Entities have no liabilities, obligations, or commitments of any nature whatsoever except those listed in the Balance Sheet dated December 31, 2017 ("Balance Sheet") or those which have incurred in the ordinary course of business which are not, individually or in the aggregate, material in amount.

67.     Jim has become aware of at least six significant liabilities that existed at the time the Contribution Agreement was executed, but which were not listed on the Balance Sheet or disclosed to Jim in any other manner.

68.     First, following the execution of the Contribution Agreement, Jim has learned that Denise took out a $250,000 bank loan on behalf of Desert Jet Charter, LLC from Pacific Premier Bank, a mere six days before Jim's investment.  This debt was not reflected on the Balance Sheet or incurred in the ordinary course of business.

69.     Not only did Denise's omission artificially inflate the equity value of Jim's investment by failing to account for all debts incurred, it is also a clear sign of Denise's intent to defraud Jim for her own personal gain. Among other things, Denise used a portion of this loan to buy herself a home in Wyoming and to make a deposit into DJ Consulting, an entity in which Jim has no interest.

70.     Second, several of the Desert Jet Entities had been sued as a result of an alleged sexual assault by Alan Robert Wilson on Gaylynn Kramer, a former personal housekeeper to Alan Robert and Denise Wilson employed by a Desert Jet Entity ("Kramer Litigation"). Neither the existence of this claim nor an estimate of defense costs was disclosed to Jim.

71.    The Desert Jet Entities are paying to defend the Kramer Litigation, including the personal defense of Denise and Alan Robert Wilson. If Ms. Kramer is successful, the Desert Jet Entities may be assessed damages. Further, the undisclosed Kramer Litigation is yet another misrepresentation based on Section 3.9 of the Contribution Agreement, which states that the Desert Jet Entities have "materially complied, and are now materially complying, with all Laws applicable to it or its business, properties, or assets."

72.    Allen Matkins not only knew that the Desert Jet Entities were sued in the Kramer Litigation, Allen Matkins *represented* them in early 2018. Despite this involvement, Allen Matkins and Mr. Libenson, who represented the Denise and the Entities during negotiations of the Contribution Agreement, did not disclose this liability or other known material litigation to Jim before he signed on August 14, 2018.

73.    Third, Denise did not disclose that John Galt Industries, LLC alleged damages against Desert Jet Charter, LLC under a commercial agreement between the two parties relating to periods before Jim's investment. Desert Jet Charter, LLC has paid considerable amount to defend these claims. Furthermore, John Galt Industries, LLC is allegedly asking up to $600,000 to settle this claim.

74.    Fourth, on December 4, 2017, about 30 gallons of Jet A fuel spilled on Desert Jet property. The county, as Desert Jet's landlord, paid to clean up the spill. Because Desert Jet did not have the appropriate insurance as required by the ground lease and fuel provider contract to cover the expense to remediate, Desert Jet still owes $95,000 plus costs to the county.

75.    Fifth, Denise now claims that a portion of approximately $200,000 in unpaid state and federal taxes from periods prior to Jim's investment are liabilities of one or more Desert Jet Entities. Mr. Ochoa and Denise prepared these tax returns, and they are believed to contain fraudulent information.

76.    During due diligence, original tax returns for the Desert Jet Entities were provided to Jim by Denise and Mr. Ochoa which did not include these liabilities. It is believed that Mr. Ochoa and Denise purposely falsified Form 1040s from 2017 to hide

tax liabilities from the banks and Jim. If Desert Jet Holdings is somehow responsible for these taxes, this is yet another undisclosed liability.

77.     In addition, this tax liability is a misrepresentation under Section 3.12 of the Contribution Agreement, which provides "all material Taxes due and owing by the Desert Jet Companies (whether or not shown on any Tax Return) have been paid." Furthermore, the undisclosed tax liability is a misrepresentation under Section 3.9 of the Contribution Agreement, which provides that the Desert Jet Entities have materially complied with all laws applicable to it or its business, properties or assets.

78.     This undisclosed tax liability has caused the Desert Jet Entities considerable expense to resolve and has thwarted Desert Jet Holdings' ability to obtain bank financing.

79.     Sixth, Steve Main, a former COO of Desert Jet, approached Jared Fox, the current CEO, in October 2019 and stated that Desert Jet owes him $450,000 for promises Denise made and did not keep. Main warned that Desert Jet would be hearing from his attorney. This potential liability or dispute was never disclosed to Jim.

**C. Jim did not discover Denise's misrepresentations until 2019.**

80.     Denise's unlawful acts and/or omissions were, by their nature, self-concealing. By failing to disclose large amounts of pertinent information, including the truth regarding Desert Jet's financial condition, ownership, and outstanding liabilities, Denise actively sought to prevent Jim from discovering her unlawful and deceptive acts and/or omissions.

81.     Jim could not have discovered, and in fact did not discover, the facts surrounding Denise's wrongdoing until Desert Jet prepared to obtain bank financing during the spring and summer of 2019 when Pacific Premier declined to lend to Desert Jet.

82.     Because Desert Jet Holdings could not obtain permanent financing from the bank, Jim agreed to provide Desert Jet Holdings with a bridge loan of $2 million. Desert Jet earmarked the loan for hangar construction, debt repayments, and working capital. If the loan was not paid off by September 30, 2019, which it was not, then Jim would obtain

unfettered financial control of Desert Jet Holdings. The loan also started owing current interest and being amortized, putting additional strain on Desert Jet Holdings.

83.    Allen Matkins represented Denise on this matter. Desert Jet Holdings did not have counsel. Nevertheless, Denise insisted that Desert Jet Holdings pay the Allen Matkins' legal bill, even though the firm represented her in her personal capacity.

**D. Denise breached the duty of loyalty she owed to Jim as a member of Desert Jet Holdings.**

84.    In addition to her misconduct before Jim invested, Denise continued to harm Jim and Desert Jet Holdings after the parties executed the Contribution Agreement.

85.    Denise owes a duty of loyalty to Jim in her capacity as a member, manager, and/or owner of Desert Jet Holdings.

86.    Denise represented, promised, and covenanted under Sections 2.7(a) and (c) of the Limited Liability Company Agreement of Desert Jet Holdings, attached as Exhibit C, that she owed to Jim the duty of loyalty.

87.    After the parties executed the Contribution Agreement, Denise violated the duty of loyalty that she owed to Jim as a member of Desert Jet Holdings.

88.    Most telling, Denise distributed $30,000 of Desert Jet assets to herself after borrowing against the Desert Jet Charter line of credit.

89.    This distribution came soon after Jim refused to approve her request for her second $500,000 dividend. Jim denied the dividend because the company once again faced financial stress, and because Denise's leadership style caused most of the financial team to leave, which meant there were no current financial statements to accurately gauge the value of the company. Denise's $30,000 distribution was therefore clearly an action designed to benefit only herself and harm Jim and the company.

90.    In addition, and as stated above, Denise hid and abused a $250,000 bank loan distributed to Desert Jet Holdings by Pacific Premier Bank for her own personal gain. She failed to disclose the loan to Jim as a debt of Desert Jet Charter before the parties executed the Contribution Agreement. She then dipped into the loan to buy herself

a home in Wyoming and, in 2019, she deposited about $80,000 into DJ Consulting, an entity in which Jim did not own.

91.     Further, Denise flew her friends to Mexico on Jim's jet and used, but did not pay for, Desert Jet's services, worth an estimated $15,000 to $20,000 in revenue.

92.     Denise also breached the duty of loyalty when it came to reporting the financials of the company. She and Mr. Ochoa filed at least one fraudulent tax return and attempted to manipulate 2018 financial statements by moving income from 2017 to 2018 to make losses appear less severe.

93.     Moreover, Denise tried to get the accountants at Desert Jet Holdings to record her outstanding $500,000 dividend as a liability in an attempt to collect the money for herself, even though the managers of Desert Jet Holdings did not declare the dividend and it was not a liability. Mr. Libenson of Allen Matkins, whose legal bills were paid by Desert Jet Holdings, told Desert Jet that Jim needed to pay Denise her remaining dividend or else the company would be at stake. Yet again, Denise put her interests before the company.

94.     Denise also sought compensation for unpaid PTO and attempted to take money from Desert Jet to solve her personal financial problems, including unpaid personal taxes and expenses, all while Desert Jet was struggling to pay its employees, customers, legal costs, and service vendors.

95.     Denise also insisted that Desert Jet Holdings pay for her and Alan Robert Wilson's legal fees in connection with the sexual harassment lawsuit filed by Ms. Kramer. Denise put her own self-interest before the company's by refusing to attend depositions until Jim agreed that Desert Jet Holdings would pay her legal fees.

96.     Upon realizing that others were aware of her misrepresentations, omissions, and self-interest, Denise created a tumultuous work environment, firing key Desert Jet employees soon after the Contribution Agreement was executed to protect herself. This disrupted the accounting operations at Desert Jet, leaving the finance office understaffed. Denise also asked the independent third party selected to serve on the Desert Jet Holdings

Advisory Board, Doug Wilson, to step down so that she could hire him to sell her interests in Desert Jet Holdings to a third party, even though Jim is entitled to the right of first refusal and the interest must be offered to him first.

97.     When Jim attempted to address the above issues with Denise, Denise responded with a threat to the company: "If you want to prevent having to be my partner over the term of multiple protracted legal battles (the company WILL fail if the partners are suing each other) then make a reasonable offer in writing and let's move on. But rest assured, lawsuits between partners will result in complete annihilation of this or any other company."

## FIRST CAUSE OF ACTION

### Fraud under Civ. Code, §§ 1572, 1709, 1710

### (Against Defendant Denise Wilson)

98.     Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth below.

99.     Since the spring of 2018, Denise has been perpetrating a fraudulent scheme designed to enrich herself at Jim's expense. Denise made fraudulent misrepresentations and omitted material information to Jim as part of a deliberate and intentional effort to induce Jim to rely on the misrepresentations and omissions and to invest money in Desert Jet Holdings.

100.     Denise made fraudulent misrepresentations and omitted to state material information with knowledge of the falsity of her statements and with the intent to defraud Jim.

101.     Denise intentionally failed to disclose material facts to Jim that she had a duty to disclose, including the financial condition, ownership interests, and liabilities of the Desert Jet Entities.

102.     Denise knew that her fraudulent material misrepresentations and omissions were not known to or reasonably discoverable by Jim. Further, Denise knew her affirmative misrepresentations were false when made.

103.   Had the omitted information been disclosed, Jim would have behaved differently.

**A. Intentional Misrepresentations about the Value of Desert Jet Entities**

104.   Denise intentionally misrepresented the value of the Desert Jet Entities because she knew Jim could afford to increase his investment to whatever alleged value she assigned to them.

105.   Denise fraudulently misrepresented under Section 3.10 of the Contribution Agreement that she provided Jim with complete copies of financial statements that were prepared in accordance with GAAP and were based on the books and records of the Desert Jet Entities to fairly present their financial condition.

106.   Not one of the financial statements that Denise provided to Jim captured the actual, destitute financial stability of the Desert Jet Entities.

107.   Nevertheless, and as Denise intended, Jim relied on her manufactured financial statements because the intent of the parties was to achieve equal ownership in Desert Jet Holdings through equal investments. As such, Denise's misrepresentations formed the basis of his own investment. Jim's reliance was justifiable because Denise promised under Section 3.10 of the Contribution Agreement that the financial statements fairly presented the financial conditions of the Desert Jet Entities and were made in accordance with GAAP.

108.   But Denise lied. Based on the actual financial condition of the Desert Jet Entities at the time of Jim's investment and using consistent valuation methodologies, the value of Denise's contribution to Desert Jet Holdings was actually materially less.

109.   Thus, Denise knowingly swindled $6 million in cash from Jim without providing him the entire interest he was owed.

**B. Intentional Misrepresentations in the Ownership Interests of the Desert Jet Entities**

110.   Denise intentionally misrepresented that her husband, Alan Robert Wilson, transferred his interest in the Desert Jet Entities to her in order to induce Jim's

investment.

111.   Sections 3.2, 3.3, 3.4, 3.5, 3.6, and Recital C of the Contribution Agreement separately state six times that Denise was the sole owner of the Desert Jet Entities and that she did not need the consent of anyone to complete the transactions contemplated by the Contribution Agreement.

112.   Despite being repeatedly represented in the Contribution Agreement and directly to Jim, Denise knew that Alan Robert Wilson still maintained ownership interests in the Desert Jet Entities at the time the Contribution Agreement was executed.

113.   Denise knew Alan Robert Wilson never transferred his interests in the Desert Jet Entities to her because such transfer was set to occur only after Denise paid him $500,000 per an alleged separate agreement between Denise and Alan Robert Wilson. To date, it is believed Denise has paid only $250,000. Moreover, Denise admitted to Jim that her representation was false.

114.   Denise could have accounted for Alan Robert Wilson's interest in the Contribution Agreement, but instead she instructed Jim's legal counsel that she had 100 percent ownership in all of the Desert Jet Entities and to remove mention of Alan Robert Wilson included in earlier drafts of the Contribution Agreement.

115.   Denise fraudulently misrepresented herself as the sole owner of the Desert Jet Entities to inflate the value of her own interests so that Jim had to shell out a larger investment.

116.   The fact the Desert Jet Entities ownership interests were unrecorded and that Allen Matkins, Mr. Libenson, Mr. Ochoa, and the Accounting Firm knew and did not report that the representations in the Contribution Agreement were false, all support Jim's justifiable reliance on Denise's intentional misrepresentation.

117.   As a result of Jim's reliance, Desert Jet Holdings has been unable to obtain proper bank financing due in part to the fact that the banks cannot reconcile the conflicting ownership interests. Instead, Desert Jet Holdings has come to rely on Jim to bridge the financing with a loan of $2 million.

118.     Moreover, Alan Robert Wilson's undisclosed ownership depletes value from Jim's investment. Instead of Desert Jet Holdings owning 100 percent of all the Desert Jet Entities, it now owns only 50 percent of one or more of these entities. As a result, Denise's supposedly "equal" investment in Desert Jet Holdings was significantly less than Jim's $6 million investment.

**C. Intentional Omissions Relating to the Liabilities of the Desert Jet Entities**

119.     Denise intentionally omitted outstanding liabilities that she knew threatened the financial stability of Desert Jet Holdings in order to entice a larger investment from Jim.

120.     Under Section 3.11 of the Contribution Agreement, Denise fraudulently misrepresented that the Desert Jet Entities have no liabilities, obligations, or commitments of any nature whatsoever except those listed in the Balance Sheet dated December 31, 2017 ("Balance Sheet").

121.     Nevertheless, Denise failed to disclose that she took out a $250,000 bank loan on behalf of Desert Jet from Pacific Premier Bank, a debt that was not reflected on the Balance Sheet or incurred in the ordinary course of business.

122.     Not only did Denise's omission artificially inflate the equity value of Jim's investment by failing to account for all debts incurred, it is also a clear sign of Denise's intent to defraud Jim for her own personal gain. Among other things, Denise used a portion of this loan to buy herself a home in Wyoming and to make a deposit into DJ Consulting, an entity in which she is the only owner.

123.     Denise also knew that she and several of the Desert Jet Entities had been sued as a result of an alleged sexual assault by her husband Alan Robert Wilson on Gaylynn Kramer, a former personal housekeeper to the Wilsons employed by a Desert Jet Entity. The Desert Jet Entities are paying to defend this litigation, including the defense of Denise and Alan Robert Wilson. This undisclosed liability is yet another misrepresentation based on Section 3.9 of the Contribution Agreement, which states that the Desert Jet Entities have "materially complied, and are now materially complying,

TUCKER ELLIS LLP

Chicago ◆ Cleveland ◆ Columbus ◆ Houston ◆ Los Angeles ◆ San Francisco ◆ St. Louis

with all Laws applicable to it or its business, properties, or assets."

124. In addition, Denise knew that John Galt Industries, LLC asserted damages against Desert Jet Charter, LLC under a commercial agreement between the two parties relating to periods before Jim's investment. In addition, Denise admitted that Desert Jet Charter, LLC has paid, and continues to pay, a considerable amount to defend these claims. Moreover, Desert Jet Holdings faces an alleged demand upwards of $600,000 to settle this claim.

125. Denise also knew that Desert Jet owed $100,000 for a jet fuel clean-up project from December 4, 2017, which Desert Jet incurred because it did not have the appropriate insurance as required by the ground lease to cover the expense to remedy.

126. Moreover, Denise knew of approximately $200,000 in unpaid state and federal taxes from periods prior to Jim's investment that are alleged liabilities of one or more Desert Jet Entities. If Desert Jet Holdings is somehow responsible for these taxes, this is yet another undisclosed liability.

127. The unpaid taxes relate to 2017 tax returns prepared by Denise and Mr. Ochoa who conspired together then, and later during the negotiations of the Contribution Agreement, to purposefully hide this liability.

128. The undisclosed tax liability is a fraudulent misrepresentation under Section 3.12 of the Contribution Agreement, which provides "all material Taxes due and owing by the Desert Jet Companies (whether or not shown on any Tax Return) have been paid." Furthermore, the undisclosed tax liability is an intentional misrepresentation under Section 3.9 of the Contribution Agreement, which provides that the Desert Jet Entities have materially complied with all laws applicable to it or its business, properties or assets. This undisclosed tax liability has caused the Desert Jet Entities considerable expense and is yet another factor contributing to Desert Jet's ability to obtain bank financing.

129. Denise also failed to disclose to Jim that there was a dispute between Denise and Desert Jet's former COO, Steve Main, which may result in a lawsuit. Main alleges

that Denise owes him $450,000 related to false promises made in an agreement between himself and Denise. Jim does not know the terms of this alleged agreement because Denise never disclosed it.

130.   Denise covered-up these liabilities to prevent them from cutting into the value of the Desert Jet Entities, which she was to contribute in lock-step to Jim's cash investment. Moreover, Jim has since learned that Denise has continued to cover up significant unpaid tax liabilities and litigation matters when supplying information to at least one bank in pursuit of a commercial loan.

131.   Jim justifiably relied on Denise's representation because she had superior knowledge of the facts surrounding the liabilities and allayed his doubts.

**D. Compensatory Damages**

132.   The foregoing affirmative misrepresentations, false promises, and concealment of material facts caused Jim to suffer substantial harm, including loss of value on his investment and potential hindrance on Desert Jet Holdings' ability to pay out dividends given its now-known liabilities.

133.   Given the abundance of misrepresentations about the financial stability, ownership, and liabilities of Desert Jet Holdings, Plaintiff prays leave of court to amend this complaint to set forth the exact amount of such compensatory damages once the same are ascertained.

**E. Punitive Damages**

134.   Denise's conduct in perpetrating the above-mentioned frauds was willful, malicious, and/or specifically calculated to cause injury to Jim.  Jim is, therefore, in addition to compensatory damages, entitled to punitive damages to deter similar conduct.

## <u>SECOND CAUSE OF ACTION</u>

### Negligent Misrepresentation

### (Against Defendant Denise Wilson)

135.   Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth below.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

136.   Denise made negligent misrepresentations to Jim with the intent to induce Jim to rely on the misrepresentations and to invest money in Desert Jet Holdings. Denise falsely represented that she presented Jim with financial statements backed by GAAP, that she was the sole owner of the Desert Jet Entities, and that she had disclosed all liabilities that she was aware of. Denise knew that these assertions were false at the time they were made.

137.   Denise gave information to Jim that was to mislead for want of suppressed facts. Denise knew with substantial certainty that Jim would rely on these representations.

138.   Even if Denise did not know that the representations were false when made, Denise was reckless or negligent in not knowing those facts. Such recklessness and/or negligence is evidenced in part by the fact that she controlled the private Desert Jet company and knew it was unreasonable for an outsider, like Jim, to know confidential and nuanced information about all aspects of the business.

139.   Jim justifiably relied on Denise's misrepresentations in investing in Desert Jet Holdings.

140.   Had Jim known that the falsity of Denise's misrepresentations about Desert Jet Holdings, its owners, and liabilities, Jim would not have invested or would have invested less.

**THIRD CAUSE OF ACTION**

**Breach of Contract**

**(Against Defendant Denise Wilson)**

141.   Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth below.

142.   On August 14, 2018, Denise, Jim, and Desert Jet Holdings entered into a contractual agreement whereby Jim invested a total of $6 million in return for 49 Company Common Units of Desert Jet Holdings based on representations made by Denise and the company.

143.   Denise breached the Contribution Agreement by failing and refusing to

uphold the terms upon which Jim predicated his investment.

144.   As a direct and proximate result of the foregoing breaches of contract, Jim has been damaged in a sum to be proven at trial.

## FOURTH CAUSE OF ACTION

### Violation of Cal. Corp. Code §§ 25401, 25501

### (Against Defendant Denise Wilson)

145.   Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth below.

146.   On August 14, 2018, Jim purchased 49 Company Common Units in Desert Jet Holdings for a total price of $6 million.

147.   Denise offered to sell, and sold, the security described above by means of the written Contribution Agreement, which included false and omitted statements of material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading in that Denise misrepresented and concealed the true financial condition, ownership interests, and liabilities of the Desert Jet Entities.

148.   The statements made by Denise were untrue in that the Desert Jet Entities' financial statements provided to Jim were littered with false information unbacked by GAAP or fairness. The actual ownership of the Desert Jet Entities was splintered between the Wilson family, despite Denise maintaining that she was the 100 percent owner. Although Denise represented that she disclosed the liabilities of the Desert Jet Entities, several significant liabilities pre-dating Jim's investment have muddied the company's future financial stability, reputation, and ability to secure financing.

149.   Jim did not know that these material statements, or lack thereof, were false at the time the Contribution Agreement was executed. If Jim had known of their existence, he would not have purchased interests in Desert Jet Holdings or would have paid much less.

150.   Denise's conduct as described in this complaint was in violation of California Corporations Code § 25401, which provides that it is "unlawful for any person

to offer or sell a security in this state, or to buy or offer to buy a security in this state, by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading."

151.   As of the date this complaint was filed, Jim has received the sum of $0 as income on the security.

152.   Under California Corporations Code § 25501, Jim is entitled to rescind the sale of the security described above and recover the entire amount of consideration paid for the security, plus interest at the legal rate, less the amount of any income received on the security.

153.   Before entry of judgment in this action, Jim will tender to Desert Jet Holdings the security purchased from it.

## FIFTH CAUSE OF ACTION

### Violation of § 10(b) of the Securities Exchange Act and Rule 10b-5
### (Against All Defendants)

154.   Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth below.

155.   This claim is based upon § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b-5, promulgated thereunder.

156.   Denise made the statements described above in connection with the sale of securities.

157.   These statements were materially false and misleading in violation of § 10(b) of the Securities Exchange Act and Rule 10b-5. The statements were materially false and misleading, and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

158.   Denise had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Jim, or, in the alternative,

acted with reckless disregard for the truth when she failed to disclose the true facts in the statements to Jim.

159.   In addition, Denise's attorney, Mr. Libenson of Allen Matkins, disseminated these materially false and misleading statements provided by Denise with the intent to contribute to the fraudulent scheme, and he and his law firm are likewise primarily liable.

160.   The Practice Certified Public Accountants, Inc. and Mr. Ochoa acted as accountants for Denise and likewise prepared material information about the Desert Jet Entities knowing of Denise's misrepresentations and omissions. Mr. Ochoa and his Accounting Firm knew that Denise manufactured the financial statements so that the Desert Jet Entities appeared financially stable on paper. Mr. Ochoa and his accounting firm are likewise primarily liable.

161.   Jim relied on the statements set forth above in making the investment decision to purchase and/or invest in Desert Jet Holdings.

162.   Had Jim known of the materially adverse information that was not disclosed by Denise, he would not have purchased the securities or purchased the securities at a lower price, and he would not have sustained damages.

163.   As a result of Denise's false representations, Jim has sustained a total loss of all amounts invested, and had the representations been true, Jim would not have sustained this loss.

### SIXTH CAUSE OF ACTION
**Breach of Duty of Loyalty**
**(Against Defendant Denise Wilson)**

164.   Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth below.

165.   Denise owes a duty of loyalty to Jim in her capacity as a member, manager, and/or owner of Desert Jet Holdings.

166.   Denise represented, promised, and covenanted under Sections 2.7(a) and (c) of the Limited Liability Company Agreement of Desert Jet Holdings that she owed to Jim

26
COMPLAINT

the duty of loyalty.

167.   Jim is informed and believes, and on that basis alleges, that Denise breached her duty of loyalty owed to Jim by drawing $30,000 from the Desert Jet Holdings' line of credit to distribute to herself.

168.   Such action is a breach of her duty of loyalty because it was designed to benefit herself to the detriment of Desert Jet Holdings and Jim.

169.   Likewise, Denise concealed and abused a $250,000 bank loan from Pacific Premier Bank for her own personal gain. She failed to disclose the loan to Jim as a debt of Desert Jet Charter, LLC before the parties executed the Contribution Agreement. She then dipped into the loan without Jim's knowledge to buy herself a home in Wyoming and, in 2019, she deposited about $80,000 into DJ Consulting, an entity in which she is the only owner and the only person who stands to benefit.

170.   Denise took company resources without paying for them. She flew her friends to Mexico on Jim's jet and did not pay the company for its service, worth an estimated $15,000 to $20,000 in revenue.

171.   Denise also impeded Desert Jet Holdings' ability to obtain bank financing by being nonresponsive to bank requests.

172.   Denise put her own self-interest before the company's by refusing to attend depositions in connection with the sexual harassment lawsuit filed by Ms. Kramer until Jim agreed that Desert Jet Holdings would pay her legal fees.

173.   In addition, Denise breached her duty of loyalty to Jim after the execution of the Contribution Agreement when it came to reporting the financials of the company. She filed a fraudulent tax return in 2017 with the help of Mr. Ochoa. She tried to get her accountants to put Jim's investment on the balance sheet to trigger her second $500,000 dividend. She conspired with Mr. Ochoa to attempt to manipulate 2018 financial statements by moving income from 2017 to 2018 to make losses appear less severe. Denise also sought compensation for unpaid PTO and attempted to take money from Desert Jet to solve her personal financial problems.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

174.    Moreover, Denise disrupted company operations when she fired valuable Desert Jet employees soon after the Contribution Agreement was executed to protect her misrepresentations, omissions, and self-interest from coming to light.

175.    Denise also asked a member of the Desert Jet Holdings Advisory Board, Doug Wilson, to step down so that she could hire him to sell her interests in Desert Jet Holdings to someone else, even though Jim is entitled to the right of first refusal.

176.    In addition, Denise tried to get Mr. Ochoa and the Accounting Firm to record her outstanding $500,000 dividend as a liability in an attempt to collect the money for herself, even though the managers of Desert Jet Holdings did not declare the dividend. Further, her lawyer, Mr. Libenson of Allen Matkins, told Desert Jet Holdings that Jim needed to pay Denise her remaining dividend or else the company would be at stake.

177.    Further telling, Denise threatened to ruin Desert Jet if Jim pursued this legal action. Denise stated, "[i]f you want to prevent having to be my partner over the term of multiple protracted legal battles (the company WILL fail if the partners are suing each other) then make a reasonable offer in writing and let's move on. But rest assured, lawsuits between partners will result in complete annihilation of this or any other company."

178.    Jim suffered damages as a proximate cause of Denise's misconduct in a sum exceeding the amounts invested, which shall be proved at trial.

## SEVENTH CAUSE OF ACTION

### Violation of California Corp. Code § 25504.1

### (Against Defendants Allen Matkins, Clark Libenson, The Practice Certified Public Accountants, Inc., and Adam Ochoa)

179.    Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth below.

180.    The 49 Company Common Units in Desert Jet Holding that Jim purchased through his investment were "securities" within the meaning of § 25019 of California's Corporate Securities Law of 1968.

181.   All of the Desert Jet Holdings securities were "offered for sale" in the State of California pursuant to California Corporations Code § 25008 because the issuers of such securities were located in California and/or the offers for such securities originated in California, specifically from Desert Jet's principal place of business in Thermal, California.

182.   Under California Corporations Code § 25401, "[i]t is unlawful for any person to offer or sell a security in this state . . . by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."

183.   As set forth above, the Desert Jet Holding securities were offered and sold directly to Jim through numerous untrue statements of material facts as well as omissions of material facts in the Contribution Agreement executed by Jim, Denise, and Desert Jet Holdings, in violation of California Code § 25401. Accordingly, privity exists between Jim and Denise.

184.   Such misrepresented and omitted facts are "material" within the meaning of California Corporations Code § 25401 because they were facts a reasonable investor would consider in deciding whether to invest.

185.   Allen Matkins and Mr. Libenson acted as legal counsel for Denise and prepared material information about the Desert Jet Entities knowing of Denise's misrepresentations and omissions. In particular, Allen Matkins and Mr. Libenson were aware of the undisclosed liabilities, misleading financial statements, ownership interests, and other fraud perpetrated by Denise, as more fully detailed above.

186.   Allen Matkins had direct knowledge of at least one undisclosed liability during their representation of Denise and the Desert Jet Entities in the negotiation and execution of the Contribution Agreement. Allen Matkins not only knew that the Desert Jet Entities were sued in the Kramer Litigation, Allen Matkins *represented* them in early 2018. Despite this involvement, Allen Matkins and Mr. Libenson omitted this liability.

187.   The Practice Certified Public Accountants, Inc. and Mr. Ochoa acted as accountants for Denise and likewise prepared material information about the Desert Jet Entities knowing of Denise's misrepresentations and omissions. Mr. Ochoa and his Accounting Firm knew that Denise manufactured the financial statements so that the Desert Jet Entities appeared financially stable on paper. In addition, Mr. Ochoa helped Denise file and prepare fraudulent tax returns for the Desert Jet Entities on at least one occasion.

188.   Allen Matkins, Mr. Libenson, The Practice Certified Public Accountants, and Mr. Ochoa are liable for misrepresentations and omissions made in connection with the Desert Jet Holdings securities under California Corporations Code § 25504.1 because they materially aided, with intent to deceive or defraud, in the acts or transactions constituting violations of § 25401.

189.   The aid that the above mentioned Defendants provided to the perpetration of Denise's fraudulent scheme was material, indeed essential: they helped organize the Desert Jet Holdings offering and concealed and/or aided in the fraudulent misrepresentations by Denise despite having full knowledge of the truth.

190.   Jim suffered financial losses as a result of Defendants' misconduct. Under California Corporations Code § 25501, Jim is entitled to damages as set forth in the Code.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff James McCool prays for judgment as follows:

### First Cause of Action for Breach of Contract

191.   Damages in an amount to be proved at trial, but which is not less than $8,000,000 plus interest;

### Second Cause of Action for Fraud

192.   Compensatory damages in an amount to be proved at trial, but which are not less than $8,000,000 plus interest;

193.   Punitive damages as permitted by law in an amount to be determined at trial;

TUCKER ELLIS LLP

Chicago ◆ Cleveland ◆ Columbus ◆ Houston ◆ Los Angeles ◆ San Francisco ◆ St. Louis

### Third Cause of Action for Negligent Misrepresentation

194.   Compensatory damages in an amount to be proved at trial, but which are not less than $8,000,000 plus interest;

### Fourth Cause of Action for Violation of California Securities Law

195.   Rescinding the sale of the security and ordering Denise to pay to Jim the sum of $6,000,000, the consideration paid for the security, plus rescission of the $2 million bridge loan, and interest at the legal rate, less the amount of the income received by Jim on the security;

### Fifth Cause of Action for Violation of Rule 10b-5

196.   Rescinding the sale of the security and ordering Denise to pay to Jim the sum of $6,000,000, the consideration paid for the security, plus recession of the $2 million bridge loan, and interest at the legal rate, less the amount of the income received by Jim on the security;

### Sixth Cause of Action for Breach of Duty of Loyalty

197.   Damages in an amount to be proved at trial, but which is not less than $8,000,000 plus interest;

### Seventh Cause of Action for Against Defendants Allen Matkins, Clark Libenson, The Practice Certified Public Accountants, Inc., and Adam Ochoa for Violation of California Securities Law

198.   Damages in an amount to be proved at trial, but which is not less than $8,000,000 plus interest;

### On All Causes of Action

199.   An award of prejudgment and post-judgment interest;

200.   Costs, interest, and such other and further relief as the Court deems just and proper.

TUCKER ELLIS LLP

Chicago ◆ Cleveland ◆ Columbus ◆ Houston ◆ Los Angeles ◆ San Francisco ◆ St. Louis

1

2    DATED:  December 30, 2019                    TUCKER ELLIS LLP

3

4                                          By:   */s/ Edward W. Racek*
5                                                Matthew I. Kaplan
                                                 Edward W. Racek
6                                                Attorneys for Plaintiff
                                                 JAMES D. MCCOOL
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

## **JURY TRIAL DEMAND**

Plaintiff demands a trial by jury of all issues so triable.

DATED:  December 30, 2019                    TUCKER ELLIS LLP


By:   */s/ Edward W. Racek*
        Matthew I. Kaplan
        Edward W. Racek
        Attorneys for Plaintiff
        JAMES D. MCCOOL